IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

PHILIP R. BOARDMAN,

      Plaintiff,

v.                             CASE NO. 2:04-cv-00895

JO ANNE BARNHART,
Commissioner of Social Security,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the court are the parties' cross-motions for judgment on the pleadings.

Plaintiff, Philip Boardman (hereinafter referred to as "Claimant"), protectively filed applications for SSI and DIB on April 23, 2002, alleging disability as of January 1, 1995, due to back, left knee and left elbow impairments.  (Tr. at 66-68, 83, 133-35.)  The claims were denied initially and upon

reconsideration.   (Tr. at 36-39, 42-43, 137-41, 143-44.)   On February 25, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ").   (Tr. at 33.)   The hearing was held on November 14, 2003, before the Honorable Richard Maddigan. (Tr. at 242-66.)   By decision dated December 4, 2003, the ALJ determined that Claimant was not entitled to benefits.   (Tr. at 10-22.)   The ALJ's decision became the final decision of the Commissioner on July 30, 2004, when the Appeals Council denied Claimant's request for review.   (Tr. at 3-5.)   On August 18, 2004, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2003).   If an individual is found "not disabled" at any step, further inquiry is unnecessary.   Id. §§ 404.1520(a), 416.920(a).   The first inquiry under the sequence is

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2003). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 11.) Under the second inquiry, the ALJ found that Claimant suffers from severe back, knee and elbow impairments. (Tr. at 11.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 17-19.) As a result, Claimant cannot return to his past relevant work. (Tr. at 18.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as cashier in a booth (parking lot attendant), building cashier, self service gas station attendant, toll collector and ticket seller, which exist in significant numbers in the national economy. (Tr. at 19.) On this basis, benefits were denied. (Tr. at 20.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

    A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

Claimant's Background

    Claimant was forty-seven years old at the time of the

administrative hearing.  (Tr. at 133, 242.)  Claimant attended

school through the tenth grade.  (Tr. at 254.)  In the past, he

worked as a boilermaker and roofer.  (Tr. at 246, 248.)

The Medical Record

    The court has reviewed all evidence of record, including the

medical evidence of record, and will summarize briefly the medical

evidence of record related to Claimant's mental impairments.

    On December 20, 2001, Claimant was hospitalized after having

an alcohol withdrawal seizure.  Claimant had a history of alcohol

withdrawal seizures. Claimant had not been drinking for seven days and had been taking his friend's Valium to avoid having seizures, but eventually ran out. Claimant reported a seizure while hanging Christmas lights. Claimant was diagnosed with an alcohol withdrawal seizure and provided Librium. (Tr. at 151-52.)

During a consultative physical examination on July 14, 2002, Claimant reported to Nilima Bhirud, M.D. that he quit drinking two years ago. (Tr. at 160.)

On October 14, 2002, Claimant reported to the emergency room with complaints of increased depression since the death of his mother in February and thoughts of harming himself. (Tr. at 201.) "Since his mother died in February of 2002, he has had progressive dysphoria, pathological grieving with partial self-medication through alcohol dependence. He had increased psychosocial dysfunction, as well as occupational dysfunction in the last month including hopelessness, helplessness, suicidal ideation and a gesture prior to admission." (Tr. at 206.) Claimant reported sleeping only three to four hours over the past six days prior to admission. Claimant reported drinking a twelve-pack of beer, at times, every other day. (Tr. at 204.) Claimant was diagnosed with major depressive disorder, single episode, moderately severe and alcohol dependence on Axis I, and an Axis II diagnosis was deferred. Claimant's GAF was rated at 45. (Tr. at 206.) Claimant was able to detoxify without significant complications and was

6

discharged on October 20, 2002, in stable condition. His
medications included Ativan, Antabuse, Neurontin and Effexor. (Tr.
at 194, 204.)

On November 5, 2002, Claimant was hospitalized after a motor
vehicle accident. Claimant reported a history of depression and
that he was currently taking an antidepressant. Claimant admitted
drinking alcohol on the night of the accident. (Tr. at 197.)

Claimant was admitted to the hospital on February 3, 2003,
after an altercation with his brother. Law enforcement reported
that Claimant lost his temper and was tearing up his house prior to
being restrained by his brother. Claimant was intoxicated. He was
diagnosed with corneal abrasion OD, fracture of the left fourth
metacarpal and multiple contusions secondary to assault. (Tr. at
190-91.)

On April 8, 2003, Claimant was hospitalized again, this time
complaining that he felt like he was going to hurt himself for the
past year. Claimant reported that his mother died a year ago and
that he had been depressed ever since. Claimant reported he no
longer used alcohol, tobacco or illicit drugs. Claimant was
diagnosed with acute depression and acute suicidal ideation. (Tr.
at 186.) Claimant was admitted to Highland Hospital. (Tr. at
182.)

Claimant was hospitalized at Highland Hospital from April 9,
2003, through April 15, 2003. Claimant's mood was depressed and

anxious, and his affect was congruent.  Judgment and insight were limited, as was impulse control.  Claimant initially was diagnosed with major depression disorder, severe, recurrent without psychosis, alcohol dependence in partial remission and rule out marijuana abuse versus dependence on Axis I.  No Axis II diagnosis was made.  Claimant's GAF was rated at 30.  (Tr. at 212.)  On discharge, Claimant was diagnosed with major depressive disorder, severe, recurrent, without psychosis, alcohol dependence in partial remission and marijuana abuse on Axis I, and there was no Axis II diagnosis.  Claimant's GAF was rated at 45.  Claimant received counseling to help him handle stressors and depression.  Claimant was discharged with prescriptions of Wellbutrin and BuSpar and instructed to follow up with outpatient treatment.  (Tr. at 209-10.)

Claimant was hospitalized at Oaklawn Hospital from June 3, 2003, to June 9, 2003.  In the initial assessment, Claimant reported drinking a half gallon of liquor the night before the admission and more the day of admission.  Claimant reported feeling hopeless and chronically suicidal.  Claimant's affect was blunt to flat.  Claimant had fair concentration.  Claimant's GAF on admission was 45.  He was diagnosed with alcohol withdrawal and alcohol dependence, severe, cannabis dependence and history of major depression, recurrent, without psychotic features on Axis I and dependent and avoidant personality traits on Axis II.  (Tr. at

8

216.)    Tim McFadden, M.D. noted that "[i]t was difficult to determine during this hospitalization what was chronic anxiety, what was some sense of possible malingering, and what was true chemical dependency for which he was in denial of.  Clearly he has had episodes of seeking treatment for alcohol dependence when he has had times of a great deal of stress."  (Tr. at 217.)    Dr. McFadden also observed that Claimant "verbalizes motivation for treatment but also seems to be highly invested in obtaining disability.  I cannot give a firm opinion regarding his need for disability but it does appear that personality factors are playing into his decision not to work."  (Tr. at 222.)

The record includes a Discharge Aftercare Report from Oaklawn Psychiatric Center.  Claimant was diagnosed with depression and alcohol and cannabis dependence.  (Tr. at 179.)  On June 12, 2003, Claimant participated in a group therapy session.  (Tr. at 214-15.)

On September 25, 2003, Sheila Emerson Kelly, M.A. examined Claimant at the request of his counsel.  Claimant reported he stopped drinking in March of 2003.  Claimant reported living in a camping trailer next to his father's home.  Claimant spends his days around the house, watching television, doing a little work, trimming bushes and fixing the porch.  Claimant does his own laundry and cooks for himself and his father.  Claimant reported fishing sometimes.  Ms. Kelly noted that Claimant was "very absorbed in his 'depression' and a bit histrionic and egocentric.

9

It seems clear that most of his more recent hospitalizations have been because of suicidal ideation which developed when he was drinking.  When not drinking, he does not appear as suicidal." (Tr. at 229.)  Claimant's sleep was variable.  Claimant was grossly dependent and passive.  He reported difficulty remembering things. There was no evidence of psychotic dysfunction, and he was oriented to all spheres.  On the WAIS-III, Claimant attained a verbal IQ score of 71, a performance IQ score of 81 and a full scale IQ score of 74, placing him in the borderline range of intellectual functioning.  Regarding social functioning, Ms. Kelly noted that Claimant "has a relatively close social support network in his father, cousin, and brother but he is prone to a rather significant amount of interpersonal problems, particularly when drinking.  When sober, I suspect he gets along reasonably well with his family and his neighbors."  (Tr. at 232.)  Ms. Kelly diagnosed depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified and history of alcohol dependence, in five month remission by self report on Axis I and borderline intellectual functioning, dependent personality traits and rule out dependent personality disorder on Axis II.  (Tr. at 231-32.)

Ms. Kelly completed a residual functional capacity form on which she opined that without considering Claimant's alcohol abuse, Claimant is moderately limited in the ability to set realistic goals or make plans independently of others and understand,

remember and carry out detailed instructions.  She further opined that Claimant is markedly limited in the ability to maintain attention for extended periods, maintain regular attendance and be punctual within customary tolerances and complete a normal work day and work week without interruptions.  (Tr. at 233-36.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred at step five of the sequential analysis; (2) the ALJ failed to properly analyze whether substance abuse was a contributing factor material to Claimant's disability; and (3) the ALJ erred in failing to find Claimant's mental impairments severe.  (Pl.'s Br. at 10-20; Pl.'s Reply at 1-4.)

The Commissioner argues that (1) substantial evidence supports the ALJ's decision at step five of the sequential analysis; (2) substantial evidence supports the ALJ's analysis of Claimant's substance abuse; and (3) substantial evidence supports the ALJ's determination that Claimant does not suffer from a severe mental impairment.  (Def.'s Br. at 10-19.)

<u>Step Five Finding</u>

Claimant first argues that the ALJ erred at step five of the sequential analysis.  The ALJ's hypothetical question included the limitations of light work requiring a sit/stand option, an inability to climb, other postural activities on an occasional

11

basis, limited reaching, unskilled and low-stress activities and a need to avoid cold, vibrations and hazards.  (Tr. at 259.)   In response, the vocational expert testified that the

> [p]ossibilities are extremely limited with a person with this profile.  Of course, being at light and needing a sit-stand option eliminates most light jobs from being possibilities ....   And this person has the other limitations that you've asked me to consider.  A type of work that comes to mind that I think could still be carried out - - and of course this would be in reduced numbers because it is a light job typically - - is some types of cashier jobs ....

(Tr. at 259-60.)   The ALJ identified the cashier jobs of parking lot or building cashier, self-service gas station cashier or toll collector.  (Tr. at 260.)   The vocational expert testified that there were 59,000 regional positions and 775,000 positions nationally.  The vocational expert testified that "I've cut [those numbers] by about three-quarters to allow for the sit-stand option."  (Tr. at 260.)

Claimant contends that the vocational expert testified that her testimony was not consistent with the Dictionary of Occupational Titles ("DOT") because the DOT did not deal with jobs that require a sit/stand option.  Claimant argues that the ALJ did not explain how he resolved this "conflict" between the vocational expert's testimony and the DOT.  (Pl.'s Br. at 12.)  Claimant further asserts that the vocational expert's testimony that she adjusted the numbers for the sit/stand option based on her training and experience was "total speculation," because she "conceded that

none of the publications she relied upon gave the number of jobs
that would allow a sit/stand option, that she hadn't done her own
study, and that she couldn't recall placing people in jobs that
provided a sit/stand option." (Pl.'s Br. at 11.)

At the administrative hearing, the following exchange occurred
between Claimant's counsel and the vocational expert:

> Q With respect to the sit-stand option aspects of the
> jobs, the cashier jobs that you mentioned, and the number
> - - as you indicated, there's nothing in the DOT that
> would indicate the availability of these types [of] jobs
> using a sit-stand option, is there?
> A Right.  The DOT does not consider a sit-stand option in
> its classification.
> Q And the DOT, of course, does not give the numbers of
> jobs available.  Is that correct?
> A That's right.  It just classifies the jobs.
> Q And none of the publications that you're familiar with
> or that you utilize for your opinion give the number of
> jobs that would allow sit-stand options, Ms. Goudy?
> A That's right.
> Q And the - - *** you haven't done your own study or
> examined other studies that have determined the
> availability of jobs involving a sit-stand option, have
> you?
> A That's true.  I'm not sure there are such studies.
> Q Okay.  And in terms - - do you remember placing
> individuals, specific individuals, in these particular
> jobs that needed a sit-stand option?
> A Actual placements?
> Q Yes.
> A I'm sure there may have been some, but of course that
> was a number of years ago and I cannot recall specific
> incidents.
> Q And so you have no basis other than antidotal [sic]
> information as to whether  - - the number of jobs that
> would allow that.  Is that correct?
> A I'm sorry?  The number of jobs  - -
> Q That would allow a sit-stand option in the cashier
> position.
> A Well, as you said, you know, there's nothing that puts
> that in black and white for us.  So all I know to do, to
> be completely fair, is to cut the numbers drastically,

13

and I have done that.

(Tr. at 261-62.)

Social Security Ruling 00-4p states that "[w]hen there is an apparent unresolved conflict between [vocational expert] ... evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704, *2 (Dec. 4, 2000). In addition, the ALJ must "explain in the determination or decision how he or she resolved the conflict." Id., at *4.

Contrary to Claimant's assertions, the vocational expert did not testify that there was a conflict between the DOT and her testimony. When asked about any conflict, the vocational expert stated "[w]ell, of course, the DOT does not classify with consideration given to a sit-stand option." (Tr. at 261.) The vocational expert did not provide evidence that was in conflict with the DOT. Instead, she testified about an area not covered by the DOT. As such, the requirements of SSR 00-4p, which require resolution of any conflicts between vocational expert testimony and the DOT, are not activated, and the court proposes that the presiding District Judge so find. See Burns v. Barnhart, 312 F.3d 113, 128 (3d Cir. 2002) (Where certain information related to aptitude levels was not contained in the DOT, vocational expert's testimony was not in conflict with the DOT and, as such, the duty

14

on the part of the ALJ to inquire into conflicts did not arise.).

The court further proposes that the presiding District Judge find that the vocational expert's testimony is well founded and not based on mere speculation.  The vocational expert testified that she "cut the numbers drastically" because of Claimant's need for a sit/stand option based on her "training, and experience, and observation of jobs over the years." (Tr. at 261.)  Later, the vocational expert testified that because there are no studies or other evidence other than anecdotal evidence, "to be completely fair," she "cut the numbers drastically." (Tr. at 262.)

The vocational expert's testimony is not "mere speculation," as Claimant suggests.  The vocational expert identified the source of support for her testimony and even indicated she was overly conservative in her numbers because of the lack of written data on the subject.

At page twelve of Claimant's brief, he cites a number of cases, such as Haddock v. Apfel, 196 F.3d 1084 (10th Cir. 1999) and Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002), for the propositions that a vocational expert's baseless conclusions do not constitute substantial evidence and that if the basis of an ALJ's decision is challenged, the ALJ should make an inquiry to find out whether the purported expert's conclusions are reliable.  Both Haddock and Donahue dealt with conflicts between vocational expert testimony and the DOT.  Haddock, 196 F.3d at 1091 (Haddock preceded

15

SSR 00-4p, and held that "the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability."); Donahue, 279 F.3d at 446 (holding that if the foundation of the vocational expert's testimony is not challenged, the ALJ may accept the vocational expert's conclusion even if it differs from the DOT, but if the basis is questioned, the ALJ should make an inquiry to find out whether the conclusions are reliable and noting that while SSR 00-4p was not directly applicable, holding is consistent therewith).

Claimant relies on McKinnie v. Barnhart, 368 F.3d 907 (7th Cir. 2004), a case in which the vocational expert identified a certain number of jobs, and the Claimant challenged these numbers. The vocational expert in that case testified that she determined the numbers available for each job she identified based on regular market studies, Department of Labor statistics and census bureau information in combination with her personal labor market surveys. However, the vocational expert could identify no data or citations for the references she relied upon in forming her opinion.  The ALJ, who ultimately denied the claim, told the claimant's counsel that he could ask the vocational expert to supplement the record with the data she had relied upon, but only if the claimant compensated the vocational expert for her time.

The court in McKinnie determined that the case should be remanded because the ALJ's decision at step five of the sequential analysis was not supported by substantial evidence. The court explained that "[t]he claimant should not have to pay to substantiate the expert testimony relied upon by the Commissioner in seeking to meet the Step 5 burden. Presumably a vocational expert establishes the foundation for her opinions before she expresses them at a hearing." Id. at 911. Thus, the court concluded that "[w]ithout first inquiring into the reliability of [the vocational expert's] opinions, the ALJ should not have so unquestioningly accepted her testimony ...." Id.

McKinnie is distinguishable on its facts. In McKinnie, the testimony that purportedly lacked a proper foundation was the number of jobs in the national economy and, the vocational expert's testimony was based on readily available data, yet the Commissioner required the claimant to reimburse the vocational expert for producing the underlying data. No such scenario has occurred in the instant case. In fact, the vocational expert in this case testified that there is virtually no published data on the sit/stand issue and that she "drastically" reduced the numbers for the jobs she identified based on her experience, training and observation of jobs over the years.

Based on the above, the court proposes that the presiding District Judge find that the ALJ's decision at step five of the

sequential analysis is supported by substantial evidence.

Substance Abuse/Severe Mental Impairments

Next, Claimant argues that the ALJ failed to properly analyze whether his substance abuse was a contributing factor material to his disability.  Claimant asserts that the ALJ did not conduct the requisite analysis related to substance abuse and that it is "unclear from his decision whether he determined that substance abuse was or was not material." (Pl.'s Br. at 15.)  In addition, Claimant avers that the ALJ did not attempt to separate the effect of his substance abuse from his other mental impairments to determine if the mental impairments remain and result in some functional limitation.  Claimant asserts that his "anxiety, depression, and substance abuse are inextricably intermingled" and that "for the ALJ to conclude that their functional effects can be separated without the advice of a medical expert is reversible error." (Pl.'s Br. at 16-17.)  Claimant further asserts that his "GAF scores, Psychologist Kelly's report and residual functional capacity assessment, and other evidence establishes [sic] that his mental impairments, at least in combination with his substance abuse, render him totally disabled." (Pl.'s Br. at 16; Pl.'s Reply at 4.)  Claimant argues that the ALJ failed to consider the fact that he experienced periods of sobriety and that his substance abuse was in partial remission. (Pl.'s Br. at 17.)

In a related vein, Claimant argues that the ALJ erred in

finding Claimant suffered from no severe mental impairments independent of his substance abuse.  Claimant notes that "every mental health practitioner or doctor who treated or examined Boardman found significant mental problems" (Pl.'s Br. at 18), and Claimant was prescribed prescription medication for his mental impairments (Pl.'s Br. at 19).

Under the Social Security Act, "[a]n individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  The Amendment and the social security regulations set up a two-step analysis for determining this issue.  Briefly, the ALJ first must determine whether the claimant is disabled.  See 20 C.F.R. §§ 404.1535(a) and 416.935(a) (2003).  If the ALJ does conclude that the claimant is disabled, he or she must then ask whether alcoholism or drug addiction is a contributing factor to claimant's disability.  Id.  Alcoholism or drug addiction is a contributing factor if the claimant would not be disabled if he or she stopped using alcohol or drugs.  See 20 C.F.R. §§ 404.1535(b)(1) and 416.935(b)(1) (2003).

Claimant relies on an August 30, 1996, memorandum to various departments within the Social Security Administration ("SSA"), which stated that SSA policy mandates a finding of not material where "it is not possible to separate the mental restrictions and

19

limitations imposed by [drug or alcohol abuse] and the various other mental disorders shown by the evidence ...." Cox, Dale, Social Security Administration, Emergency Teletype, August 30, 1996, Response to Question Number 29 (found at www.ssas.com under Public Files, DAA Q&A Teletype - 8/30/96 Emergency Teletype).

In his decision at step two of the sequential analysis, the ALJ acknowledged that Claimant "alleged experiencing depression and anxiety." (Tr. at 11.) However, the ALJ determined that "[t]he latter two psychological problems are exacerbated when the claimant, based on the documentary evidence discussed below, abuses alcohol, marijuanna [sic], or Valium .... When not abusing drugs and/or alcohol, the latter two situations are occupationally slight ...." (Tr. at 11.) Thus, the ALJ found no severe mental impairments.

Later in his decision, the ALJ found that

[h]is mental health disorders are much less severe when he is not experiencing significant substance abuse difficulties. Information in the record from Ms. Kelly's report, treatment records from Thomas Memorial Hospital, Highland Hospital, and Oak Lawn Hospital discloses that the claimant's anxiety and depression were not problematic situations independently of substance abuse. Information from all these sources establishes that when not abusing drugs or alcohol, his activities of daily living and social functioning are slightly limited. These are moderately limited under the influence of alcohol. The undersigned finds that given evidence involving borderline intellectual functioning, the claimant is ill equipped to handle complex job functions, but can handle those that are detailed. This finding is consistent with his roofing work that included operating a business and supervising people. He is able to perform the demands typically associated with unskilled, entry

20

level functions.

When seen at Highland Hospital and the Oak Brook
facility, the claimant's GAF on both occasions was quite
low (45).  However, when not involved in substance abuse
related difficulties, it is reasonable to conclude such
is otherwise satisfactory.  Accordingly, the record shows
[no] decompensation episodes of extended duration in the
absence of polysubstance abuse.  Therefore, the criteria
of the above-described medical listings, sections 12.04,
12.05C and 12.06 are neither met nor equaled.

(Tr. at 14-15.)

The ALJ was not as explicit as he could have been in his
decision in explaining his findings related to Claimant's substance
abuse and its effect.  Nevertheless, the court cannot recommend
remand on this basis and instead, proposes that the presiding
District Judge find that any errors in this regard are harmless.
Courts have applied a harmless-error analysis in the context of
Social Security appeals.  One illustrative case provides:

Moreover, "[p]rocedural perfection in administrative
proceedings is not required. This court will not vacate
a judgment unless the substantial rights of a party have
been affected." Mays v. Bowen, 837 F.2d 1362, 1364 (5th
Cir.1988). The procedural improprieties alleged by Morris
will therefore constitute a basis for remand only if such
improprieties would cast into doubt the existence of
substantial evidence to support the ALJ's decision.

Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988); Fisher v.
Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989)("No principle of
administrative law or common sense requires us to remand a case in
quest of a perfect opinion unless there is reason to believe that
the remand might lead to a different result."). Our Court of
Appeals, in a number of unpublished decisions, has taken the same

approach.  See, e.g., Bishop v. Barnhart, No. 03-1657, 2003 WL
22383983, at *1 (4th Cir. Oct 20, 2003); Camp v. Massanari, No. 01-
1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); Spencer v.
Chater, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

     Despite  the  ALJ's  failure  to  fully  explain  his  findings
related  to  Claimant's  substance  abuse  or  to  fully  follow  the
regulations related to the evaluation of substance abuse, the ALJ's
decision  makes  clear  that  independent  of  substance  abuse,
Claimant's mental impairments were not severe aside from his need
for  unskilled,  entry  level  functions  because  of  borderline
intellectual  functioning,  and  that  finding  is  supported  by
substantial evidence.

     The  ALJ  indicated  he  determined  Claimant's  "mental  health
disorders  are  much  less  severe  when  he  is  not  experiencing
significant substance abuse difficulties" based on evidence from
Ms.  Kelly,  treatment  records  from  Thomas  Memorial  Hospital,
Highland Hospital and Oak Lawn Hospital.  (Tr. at 14.)  Indeed, Ms.
Kelly observed that Claimant was "very absorbed in his 'depression'
and a bit histrionic and egocentric.  *It seems clear that most of
his more recent hospitalizations have been because of suicidal
ideation which developed when he was drinking.  When not drinking,
he does not appear as suicidal.*"  (Tr. at 229) (emphasis added).
Claimant underwent detoxification at Thomas Memorial Hospital in
October of 2002, without significant complications and left the

hospital in stable condition. (Tr. at 204.) At Highland Hospital in April of 2003, although Claimant reported he no longer abused alcohol, this was questioned by the physician who admitted him. (Tr. at 213.) At Oaklawn Hospital in June of 2003, Dr. McFadden noted that "[i]t was difficult to determine during this hospitalization what was chronic anxiety, what was some sense of possible malingering, and what was true chemical dependency for which he was in denial of. Clearly he has had episodes of seeking treatment for alcohol dependence when he has had times of a great deal of stress." (Tr. at 217.) Dr. McFadden also observed that Claimant "verbalizes motivation for treatment but also seems to be highly invested in obtaining disability. I cannot give a firm opinion regarding his need for disability but it does appear that personality factors are playing into his decision not to work." (Tr. at 222.)

While Claimant was diagnosed with other mental impairments in addition to substance abuse during his various hospitalizations and consultative examinations, the above evidence supports a finding that absent substance abuse, those impairments were not severe. Although Claimant asserts that he received low GAF scores when his alcoholism was in partial remission, the physician at Highland Hospital stated that Claimant was in partial remission and noted a questionable relapse. (Tr. at 212-13.) While Ms. Kelly noted a number of marked limitations on the Assessment she completed and

23

stated she did not consider alcohol abuse because Claimant was sober by self-report (Tr. at 236), her written report makes clear that when sober, Claimant's mental impairments were not as severe.

Claimant's assertion that the ALJ should have called a medical expert to testify at the administrative hearing is unconvincing. The determination about whether to call a medical expert is within the Commissioner's discretion. <u>See</u> 20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) (2003) ("[a]dministrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to subpart P of part 404 of this chapter"). Claimant's case is not a particularly complicated one and, the evidence of record was sufficient from which the ALJ made a reasoned decision. As such, the ALJ did not abuse his discretion in failing to call a medical expert.

Thus, the court proposes that the presiding District Judge find that any error in the ALJ's analysis of Claimant's substance abuse was harmless. The court further proposes that the presiding District Judge find that substantial evidence supports the ALJ's ultimate determination that absent substance abuse, Claimant's mental impairments were not severe and did not result in significant work-related limitations other than those identified in the residual functional capacity finding related to borderline

intellectual functioning.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Judgment on the Pleadings, GRANT the Defendant's Motion for Judgment on the Pleadings, AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable John T. Copenhaver, Jr.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.

1984).  Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to counsel of record.

_August 31, 2005_
        Date

Mary E. Stanley
Mary E. Stanley
United States Magistrate Judge

26